J-M05002-24
J-M05003-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| PETITION OF: J.R., A MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 85 EDM 2024 |

Appeal from the Order Entered August 19, 2024
In the Court of Common Pleas of Philadelphia County
Criminal Division at Nos.:  CP-51-JV-0000004-2024,
CP-51-JV-0001701-2023

| | | |
|---|---|---|
| IN THE INTEREST OF: J.R., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| PETITION OF: J.R., A MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 86 EDM 2024 |

Appeal from the Order Entered August 19, 2024
In the Court of Common Pleas of Philadelphia County
Criminal Division at Nos.:  CP-51-JV-0000004-2024,
CP-51-JV-0001701-2023

MEMORANDUM PER CURIAM:                    **FILED OCTOBER 2, 2024**

Petitioner, J.R., filed two emergency petitions for specialized review

under Pa.R.A.P. 1612 (the "Petitions"), seeking review of the August 19, 2024

orders ("Orders") of the Court of Common Pleas of Philadelphia County (the

"juvenile court"), which revoked Petitioner's probation and committed him to an out-of-home placement. Upon review, we affirm.[1]

The facts and procedural history of this case are undisputed.[2] On September 22, 2023, Petitioner, J.R., born in February 2008, was arrested and charged with theft by unlawful taking, receiving stolen property, theft from a motor vehicle, and unauthorized use of a motor vehicle at docket no. CP-51-JV-0001701-2023 (the "First Case").[3] On January 2, 2024, while on home detention, Petitioner was charged with theft by unlawful taking—movable property, receiving stolen property, unauthorized use of a motor vehicle, conspiracy, fleeing or attempting to elude officer, and theft from a motor vehicle at docket no. CP-51-JV-0000004-2024 (the "Second Case").[4] Petitioner was permitted to remain on in-home detention, as provided by Cornerstone Home Detention.

The juvenile court conducted a hearing in both cases on February 28, 2024. At the hearing, the court received evidence indicating that Petitioner's mother removed him from Ben Franklin High School because of safety

_____

[1] In light of the Supreme Court's recent decision in **In the Interest of N.E.M.**, 311 A.3d 1088, 1101 (Pa. 2024), wherein the Court held that this Court "lacks discretion to decide whether to grant or deny these petitions for specialized review," review of the merits of the instant Petitions is mandatory.

[2] Unless otherwise noted, these facts are taken from the juvenile court's September 9, 2024 Pa.R.A.P. 1612(f) opinion. **See** Juvenile Court Opinion, 9/9/24, at 1-3.

[3] 18 Pa.C.S. §§ 3921(a), 3925(a), 3934(a), and 3928(a), respectively.

[4] 18 Pa.C.S. §§ 3921(a), 3925(a), 3928(a), 903(c), 75 Pa.C.S. § 3733(a), and 18 Pa.C.S. § 3934(a), respectively.

concerns. The court also was made aware that, when Petitioner was enrolled in school, he was failing and cutting classes. According to a report prepared by Cornerstone Programs Home Detentions, Petitioner was to begin attending PVA Cyber School on March 4, 2024.

Moreover, at the hearing, Petitioner entered into an admission to unauthorized use of motor vehicle in the First Case and to receiving stolen property in the Second Case.[5] As a result, the juvenile court deferred adjudication and placed Petitioner on interim probation. The court ordered that Petitioner be subject to GPS "house restrictions" at his mother's house with the first violation sufficient to "hold, adjudicate and place" Petitioner, following a hearing, in an out-of-home facility. *See* Adjudicatory/Dispositional Hearing Order, 2/29/24. Because the court determined that Petitioner was compliant on GPS, the court discharged him from the Cornerstone In-Home Detention Program, and ordered Petitioner, among other things, to attend 15 hours of Philadelphia Youth Advocacy Program ("PYAP") per week. *Id.* The juvenile court also instructed the probation department to explore placing Petitioner with his aunt in Charlotte, North Carolina, as Petitioner's mother wanted him to reside with the aunt. *Id.*

On March 6, 2024, Probation Officer Tyrea Smith filed a motion for review, asserting that because of safety concerns, Petitioner's mother "wants courtesy supervision to be transferred to North Carolina and [Petitioner] to

_____

[5] The Commonwealth withdrew all remaining charges in both cases.

reside with maternal aunt." Motion for Review, 3/6/24. In support, Officer Smith detailed:

> Asst. Sup. Hinton was confirming demographic school information and [Petitioner's mother] reported that [Petitioner] is still enrolled at Ben Franklin HS in the 9th grade, but he has not been attending due to several youth threatening to kill him. Mother stated that [Petitioner] has been having problems with several youth for about 2 years, she cannot identify all of them because it is such a large group, but she assumes it is due to whom he associates with and the opposing group feels that he is guilty by association. He and his brother has already been assaulted by several juveniles. Then approx. on 1/24/24, the school police officer Sessom reported to [mother] that some kids were after [Petitioner] and left the school to get guns, so they told her to take him out of the school and not to return. Many various sources school staff, youth, and people in the community reported that [Petitioner] is now on a hit list.

*Id.* (sic). Officer Smith requested that Petitioner's supervision be transferred to North Carolina. On March 14, 2024, Petitioner appeared before a hearing officer, Cailin Shuler (the "Hearing Officer"), who recommended that Petitioner's courtesy supervision be transferred to North Carolina. On the same day, the juvenile court adopted the Hearing Officer's recommendations.

On April 29, 2024, Petitioner appeared before the Hearing Officer for another hearing, at which Officer Smith testified that Petitioner was sent to reside with his aunt in North Carolina on April 1, 2024. N.T. Hearing, 4/29/24, at 3. According to Officer Smith, Petitioner violated his interim probation when he left his aunt's care without permission on an unspecified date in April 2024 at 2:25 a.m. to return to Philadelphia. *Id.* at 3-4. Petitioner's mother testified that she was "concerned about his safety as well" and asked to be escorted

out of the courtroom "because some of the boys after him are here." ***Id.*** at 7-9. Petitioner's counsel informed the Hearing Officer that Petitioner returned to Philadelphia because he missed his brothers and mother. ***Id.*** at 8. Recognizing the threats to Petitioner's safety, and Petitioner's violation of interim probation, the Hearing Officer recommended that Petitioner be: (1) released from courtesy supervision in North Carolina, (2) held in secure detention at the Philadelphia Juvenile Justice Services Center ("PJJSC"), and (3) referred for investigation purposes to the Juvenile Enforcement Unit ("JET"). On the same date, the juvenile court adopted the Hearing Officer's recommendations.

On May 2, 2024, the juvenile court held a dispositional hearing, at which Petitioner and his probation officers offered testimony. Officer Smith testified that, given the safety concerns, she did not feel comfortable with Petitioner returning to his mother's care and that Petitioner should either return to North Carolina to reside with his aunt or be placed in his grandmother's care in South Philadelphia. N.T. Hearing, 5/2/24, at 5-6, 14.

The Commonwealth argued that Petitioner be adjudicated delinquent of unauthorized use of motor vehicle in the First Case and for receiving stolen property in the Second Case. ***Id.*** at 16. The Commonwealth also argued that, in light of the threats he faced, Petitioner be sent to a "secure placement" where he would be protected, and it could be ensured that he stay away from going to neighborhoods in Philadelphia where "he may be beefing with people." ***Id.*** At the conclusion of the hearing, the juvenile court issued an

- 5 -

order, adjudicating Petitioner delinquent of unauthorized use of motor vehicle and receiving stolen property.

The court directed that Petitioner be released to his grandmother's care "on GPS with house restrictions." *Id.* at 22-23; Adjudicatory/Dispositional Hearing Order, 5/2/24. The court further directed that Petitioner's movements be restricted from the 35th and 39th police districts in Philadelphia, except to attend medical appointments.[6] N.T. 5/2/24, at 25. Juvenile probation explained to Petitioner on the record the geographic boundaries of the restricted zones. *Id.* at 23-25. The court also directed that Petitioner be supervised by an adult at all times and held and committed to the state for placement after his first violation. *Id.* at 26-27. Finally, the court directed that Petitioner's probation be subject to the rules and regulations of the Philadelphia County Juvenile Probation Office. Adjudicatory/Dispositional Hearing Order, 5/2/24.

_____

[6] As the juvenile court explained, the 35th and 39th police districts are the boundaries GPS probation officers use whenever a juvenile is given area restrictions. At the time the ankle bracelet is placed on a juvenile, the GPS probation officer goes over the boundary exclusion zone with the juvenile. The 35th and 39th police districts are located in Northwest section of Philadelphia, contiguous to each other. The boundaries for the 35th district are Germantown Avenue to the West, Roosevelt Boulevard to the South, Tacony Creeks to the East and Cheltenham Avenue to the North. The boundaries for the 39th district are Wissahickon Creet to the West, Lehigh Avenue to the South, Broad Street to the East and Roosevelt Boulevard to the North. Both police districts are high-violence areas. Juvenile Court Opinion, 9/9/24, at 2-3, n.2.

On June 17, 2024, Petitioner appeared for a review hearing before the Hearing Officer. Probation Officer Lois Santaguida testified that, since residing with his grandmother, Petitioner has not had any GPS violations. N.T. Hearing, 6/17/24, at 3. Officer Smith testified that Petitioner and his friends had "beef" with another group, and that one member of that group had been shot twice in a one-week span back in August and September of the previous year. *Id.* at 4-5. Following the hearing, the juvenile court adopted the Hearing Officer's recommendation to modify the geographic restrictions, removing the 35th police district, and adding the 24th and 25th police districts. Thus, Petitioner was barred from the 39th, 24th and 25th police districts—all high-crime areas opposite and a few miles away from the grandmother's residence. These restricted areas were not arbitrary because they "were known areas and neighborhoods that JET probation was aware that Petitioner frequented when he lived with his mother." Juvenile Court Opinion, 9/9/24, at 6. Petitioner also was directed to attend 15 hours of PYAP weekly. Additionally, the probation department was permitted to implement a curfew. All other conditions of probation remained the same.

On July 31, 2024, Probation Officer Erica Brown filed a motion for amendment, alleging that Petitioner not only violated his curfew, but also entered restricted geographic areas. Specifically, Officer Brown alleged:

> On 7/25, [Petitioner] was late for his 8 p.m. curfew. At 8 p.m. [Petitioner] was located at 2700-2 W. Giard Ave. [Petitioner] did not get home until 9 p.m.

The device entered sleep mode on 7/27 and 7/29 because [Petitioner] failed to sufficiently charge the device. Charing intervals have not been long enough to prevent the device from remaining in low battery status. The device has [illegible] battery life remaining. On 7/28, there was a confirmed departure from 1006PM-1011PM (with a stop at 1906 S. 22nd St).

On 7/29, [Petitioner] entered his exclusion zone at 244 p.m. [Petitioner] was located at 3229 [N.] 15th St. GPS PO Brown contacted [Petitioner] through his bracelet to leave his exclusion zone. [Petitioner] let his exclusion [zone] at 305 p.m. By 743 p.m. [Petitioner] entered his exclusion zone again and was located at 3229 N. 15th St. [Petitioner] did not leave his exclusion zone until 813 p.m. [Petitioner] was also late for this 830 p.m. curfew. By 830 pm [Petitioner] was located at 1922 W. Diamond St. [Petitioner] did not get home until 940 p.m.

On 7/30, GPS PO Brown contacted [Petitioner's] grandmother in regard to these violations. GPS PO Brown stated to grandmother that [Petitioner] no longer has a curfew and is now house restricted. Grandmother stated that she will relay the message to him and thanked GPS PO for contacting her.

On 7/30, [Petitioner] left the house at 220 p.m. and travelled to 3016 W. Giard Ave. [Petitioner] arrived there by 317 p.m. [Petitioner] did not get home until 826 p.m.

Motion for Amendment, 7/31/24 (sic). Officer Brown requested that Petitioner be discharged from GPS monitoring and held at PJJSC.

On August 1, 2024, Petitioner once again appeared before the Hearing Officer, who heard testimony from Officer Brown, among others. Officer Brown testified that, despite being ordered to stay out of the 39th district, specifically North 15th Street, Petitioner returned to that address on July 29, 2024. N.T. Hearing, 8/1/24, at 7. Petitioner's counsel argued that Petitioner returned to the address to retrieve a charger, but when asked why Petitioner remained there for an hour, counsel stated that "[w]ell, when you're teenage

boy, it takes a little longer." *Id.* at 8-9. Officer Brown also testified that Petitioner's curfew was 8 p.m. and he violated curfew several times. *Id.* at 10-11. Officer Brown also acknowledged that prior to June 17, 2024, when Petitioner was permitted a curfew, Petitioner did not have any problems. *Id.* at 12. In response to Petitioner's counsel's suggestion that removal of curfew would remedy any problems, Officer Brown remarked that she "did remove the curfew, and he still went out." *Id.* Following the hearing, the Hearing Officer recommended that Petitioner remain on probation, but be held in secure detention at PJJSC. The Hearing Officer also recommended that Petitioner be discharged from GPS monitoring. The juvenile court adopted the Hearing Officer's recommendations on August 1, 2024.

On August 19, 2024, the juvenile court conducted an adjudicatory hearing, at which Officer Santaguida offered testimony. Officer Santaguida testified that, when Petitioner was on house restrictions, he was doing fine. N.T. Hearing, 8/19/24, at 4. According to Officer Santaguida, as soon as Petitioner was permitted a curfew, "things went out of control. He was doing what he wanted to do, missing curfew, and then the concern that we had is that he was going into his exclusion zone, which was then putting him at a safety risk." *Id.* Officer Santaguida also testified that Petitioner was in marginal compliance with PYAP. *Id.* Officer Santaguida further expressed a concern for Petitioner's safety and reluctance to place him back on GPS monitoring. *Id.* at 5. In response, the court acknowledged that Petitioner already had been on house arrest and remarked that Petitioner "proved me

- 9 -

wrong, because I thought that he was going to be able to stay in the community and do well, and I guess I made a mistake." *Id.* at 5.

Petitioner offered the testimony of his grandmother, who stated that Petitioner was safer in South Philadelphia, compliant with his conditions of probation, and doing well and getting better at home. *Id.* at 7. When asked why Petitioner kept going where he was prohibited from going, his grandmother answered that "[h]is friends, probably." *Id.* at 10.

The juvenile court stated that it explained to Petitioner at the May 2 hearing where he was barred from going while on GPS monitoring. *Id.* at 11. Similarly, the court noted that the GPS probation officer also explained the same to Petitioner when they gave him GPS instructions. *Id.* The court found that Petitioner, who is 16 years old, does not need to be spoon-fed and that he should take responsibility and accountability for his actions. *Id.* at 12. The court, therefore, revoked Petitioner's probation and committed him to Youth Forestry Camp #3 ("YFC"), a state-run out-of-home placement facility. *Id.* at 12. The court noted that YFC "is the least restrictive type of placement that is consistent with the protection of the public and best suited to [Petitioner's] treatment, supervision, rehabilitation and welfare." Dispositional Review Order, 8/19/24. The juvenile court found that Petitioner is a "pretty intelligent kid," but did not believe that he did not know where he was going when he violated the terms of his probation. N.T. Hearing, 8/19/24, at 13. The court explained that Petitioner would remain under constant supervision, be unable to act on his whims, and receive mental health counseling at YFC. *Id.* The

court remarked that Petitioner would be enrolled in programs at YFC for approximately 6 to 9 months, possibly longer depending on his behavior. *Id.* at 14. The court reasoned that "by the time he comes back, he's going to follow instructions and he's not going to get himself in trouble." *Id.*

On August 28, 2024, Petitioner filed the instant counseled Petitions,[7] which are identical to each other, asserting the juvenile court abused its discretion in committing Petitioner to out-of-home placement.[8] In support, Petitioner raises three arguments. First, Petitioner argues that the juvenile court failed to engage in an individualized assessment because it had predetermined an out-of-home placement for the first violation. Petitions at 6, 12. Second, Petitioner argues that the juvenile court failed to consider less restrictive alternatives, such as electronic monitoring with house arrest, and to delineate clearly the geographic exclusion zones. *Id.* at 6-7, 14. Third, Petitioner argues that the juvenile court failed to consider adequately

---

[7] We note that the Petitions may implicate ***Commonwealth v. Walker***, 185 A.3d 969 (Pa. 2018) (requiring appellants to file separate notices of appeal when a single order resolves issues arising on more than one lower court docket), as each petition lists two separate juvenile court docket numbers. Given the time constraints within which this Court must address petitions seeking review of juvenile out-of-home placements, and because the Commonwealth has not raised a ***Walker*** objection, we decline to address ***Walker*** in this context. For ease of disposition, we hereby consolidate the Petitions *sua sponte*.

[8] Petitioner satisfied the timeliness requirement set forth in Pa.R.A.P. 1612(a), which provides that a petition for specialized review be filed within ten days of the placement order. Here, the Petitions were filed on August 28, 2024 from the juvenile court's August 19, 2024 Orders.

Petitioner's need for treatment, supervision, and rehabilitation under 42 Pa.C.S. §§ 6301, 6352(a). *Id.* at 7, 16.

On August 30, 2024, this Court issued an order directing the juvenile court to, *inter alia*, prepare an opinion detailing the reasons for the out-of-home placement pursuant to Pa.R.A.P. 1612(f). Separately, this Court directed the Commonwealth to answer to the Petitions. On September 6, 2024, the Commonwealth filed its answer to the Petitions, urging this Court to affirm the juvenile court's imposition of out-of-home placement. The juvenile court issued an opinion pursuant to Rule 1612(f) on September 9, 2024. We now proceed to review the Petitions on their merits.

When reviewing a petition filed pursuant to Rule 1612, this Court "shall not consider any challenge to the juvenile court's selection of a specific agency or specific institution as the site of the out-of-home placement and instead may consider only a challenge to the fact that the placement is out-of-home." Pa.R.A.P. 1612(c)(1). Furthermore, this Court "shall not consider any challenge to the underlying adjudication of delinquency." Pa.R.A.P. 1612(c)(2). Thus, this Court's standard of review is whether the juvenile court abused its discretion in its dispositional order. *See In the Int. re A.D.*, 771 A.2d 45, 53 (Pa. Super. 2001) (*en banc*) ("Finding that the court properly considered the information presented to it and fashioned a disposition it believed best suited the circumstances involved, we perceive of no manifest abuse of discretion which would cause us to disturb its order."). Critically, "the Juvenile Act grants broad discretion to juvenile courts in determining

appropriate dispositions" and "this Court will not disturb the juvenile court's disposition absent a manifest abuse of discretion." *In the Int. re J.G.*, 145 A.3d 1179, 1184 (Pa. Super. 2016).

As this Court explained in *In re Love*, 646 A.2d 1233 (Pa. Super. 1994), *appeal denied*, 655 A.2d 511 (Pa. 1995),

> [T]he discretion of the Juvenile Court in implementing a disposition is broad, it is flexible and the Juvenile Court has considerable power to review and modify the commitment, taking into account the rehabilitative progress or lack of it of the juvenile. Without extreme specificity as to the error by the court in imposing the commitment, there can be no basis for setting aside the disposition.

*Id*. at 1238 n.5.

Pursuant to Section 6352(a) of the Juvenile Act, the juvenile court's disposition must "be consistent with the protection of the public interest and best suited to the child's treatment, supervision, rehabilitation and welfare[.]" 42 Pa.C.S. § 6352(a). The court must "provide balanced attention to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable the child to become a responsible and productive member of the community." *Id.*

Moreover, the Juvenile Act mandates that the court state the reasons why commitment to an out-of-home facility is "the least restrictive placement that is consistent with the protection of the public and best suited to the child's treatment, supervision, rehabilitation and welfare." 42 Pa.C.S. § 6352(c). Pursuant to Section 6301, a child should be separated from his or her parents

"only when necessary for his welfare, safety or health or in the interests of public safety." 42 Pa.C.S. § 6301(b)(3). The Juvenile Act directs the court to employ "evidence-based practices whenever possible . . . by using the least restrictive intervention that is consistent with the protection of the community, the imposition of accountability for offenses committed and the rehabilitation, supervision and treatment needs of the child." 42 Pa.C.S. § 6301(b)(3)(i).

With the foregoing standard in mind, we now turn to Petitioner's first claim that the juvenile court failed to engage in an individualized assessment because it had predetermined an out-of-home placement for the first violation. Petitions at 12.

The Juvenile Act empowers juvenile courts with wide latitude to render probationary terms that are appropriate to the individual circumstances of the child's case. **See** 42 Pa.C.S. § 6352(a); **see also In the Int. re M.M.**, 855 A.2d 112, 115 (Pa. Super. 2004) (discussing the juvenile court's failure to consider individual circumstances of a child).

Instantly, as detailed above, the record does not support Petitioner's claim. While it is true that the court had cautioned Petitioner that he could face state placement after his first violation, his eventual placement at YFC was neither perfunctory nor predetermined. Rather, the juvenile court imposed only a term at YFC following a hearing, at which the court not only learned that Petitioner had repeatedly violated the terms of his probation, but also inquired about the nature of the violations. Based on the evidence adduced at the hearing, the juvenile court determined that GPS monitoring

and house restrictions were not effective in keeping Petitioner in compliance with the terms of his probation. As a result, the court directed that Petitioner be placed out of home at YFC where his specific rehabilitative, safety and supervisory needs would be met. The court reasoned that Petitioner would be attending school, be under constant supervision, receive mental health counseling, receive other certificates, learn how to follow instructions and keep out of trouble at YFC. *See* N.T. Hearing, 8/19/24, at 14. Accordingly, we cannot conclude that the juvenile court manifestly abused its discretion. Petitioner does not obtain relief.

Insofar as Petitioner relies on *Commonwealth v. Luketic*, 162 A.3d 1149 (Pa. Super. 2017), to compel a different outcome, such reliance is misplaced because *Luketic* is distinguishable. There, the appellant—an adult—pled guilty to possessing a controlled substance that had been sold to him by his co-defendant, Lanel Buckner, who also pled guilty to certain offenses. *Id.* at 1152. At the co-defendant's sentencing hearing, which occurred before the appellant's, the trial court referred to the appellant as a "dope fiend[ ]" and stated, "[the appellant] is going to jail, too. [The appellant] is not walking out of here either." *Id.* On appeal, the appellant argued "that the court erred in not imposing an individualized sentence following his open guilty plea, and that it instead decided that [the appellant] would receive a sentence of incarceration before the sentencing proceeding began." *Id.* at 1159.

This Court agreed, holding that the trial court manifestly abused its discretion by predetermining "[the appellant's] sentence without considering individualized factors regarding appellant." *Id.* at 1163. Unlike here, the trial court in *Luketic* "made its intention clear and unequivocal" "*prior* to the commencement of [the appellant's] sentencing proceeding and before receiving any individualized information about [the appellant]." *Id.* (emphasis added). [W]ithout hearing any evidence about [the appellant] or his circumstances, it planned to send [the appellant] to jail." *Id.* We explained that the trial court "repeatedly and unequivocally" stated on the record before receiving any evidence that the appellant was going to jail. *Id.* ("'He [the appellant] is going to jail, too'; 'I am going to send him [the appellant] to jail;' 'He [the appellant] is going to jail, because he and [his co-defendant] are both opposite sides of the same coin'; 'he [the appellant] is going to jail, because creates the guy that is with him.'"). Moreover, this Court concluded that, to the extent the trial court considered other individualized sentencing factors in fashioning the appellant's sentence, the court had paid mere lip service. *Id.* at 1165. For example, the court did not order any drug treatment, despite the appellant's addiction issues. *Id.* The court also did not order a presentence investigation report, thus precluding a presumption that the court "was aware of relevant information regarding [the appellant's] character and weighed those considerations along with the mitigating statutory factors." *Id.* Accordingly, "[f]or all of these reasons," we vacated the appellant's sentence. *Id.*

Next, we address Petitioner's claim that the juvenile court failed to impose the least restrictive measures to treat and rehabilitate him. Petitions at 14. We disagree.

As stated, under Section 6352 of the Juvenile Act, when committing a juvenile to an out-of-home facility, the court is required to state on the record in open court, *inter alia*, "the reasons why commitment to that facility or type of facility was determined to be the least restrictive placement that is consistent with the protection of the public and best suited to the child's treatment, supervision, rehabilitation and welfare." 42 Pa.C.S. § 6352(c); *see* Pa.R.J.C.P. 512(D)(4)(b) (requiring the juvenile court to state on the record, among other things, why "the out-of-home placement ordered is the least restrictive type of placement").

Here, as detailed above, the record makes it clear that the juvenile court imposed the least restrictive measures multiple times, and each time they failed on account of Petitioner's non-compliance. Indeed, Petitioner was permitted to remain in his mother's care following the filing of the delinquency petition in the First Case. While on home detention, Petitioner committed more offenses in the Second Case. Petitioner thereafter admitted to unauthorized use of motor vehicle in the First Case and to receiving stolen property in the Second Case. Subsequently, the juvenile court deferred adjudication and granted Petitioner an opportunity to serve his probation at home with his aunt in North Carolina. Less than a month later, Petitioner, without permission, left his aunt's house in the middle of the night to return

to Philadelphia. Despite this violation, the juvenile court directed that Petitioner be remanded to his grandmother's custody in South Philadelphia, where he was to remain under house arrest. In so doing, the juvenile court rejected the Commonwealth's request that Petitioner be committed to an out-of-home facility. N.T. Hearing, 5/2/24, at 27-28 ("I'm trying to keep [Petitioner] in the community" . . . "I'm trying to keep him alive.").

Subsequently, after Petitioner's geographic restrictions "were more narrowly defined to mitigate any further safety concerns" and he was permitted curfew, Petitioner committed several probation violations. Specifically, he violated his curfew, failed to charge his GPS monitor, and visited restricted areas. At the core, Petitioner "refused to follow court-ordered instructions to not return to his old neighborhood, even if it is at the risk of his well-being and safety." Juvenile Court Opinion, 9/9/24, at 7.

In light of these violations and following several hearings over multiple months, the juvenile court was constrained to impose an out-of-home placement, remarking that Petitioner already had been on house arrest but "he proved me wrong, because I thought that he was going to be able to stay in the community and do well, and I guess I made a mistake." N.T. Hearing, 8/19/24, at 5. The court explained:

> Since Petitioner made his global admission on February 28, 2024, he always found a way to not comply with his probation conditions by exhibiting non-compliance behavior. As of August 19, the record reflects numerous violations of his GPS restrictions, such as breaking curfew and entering his geographical restriction areas. Petitioner refused to follow court-ordered instructions to not return to his old neighborhood, even if it is at the risk of his

- 18 -

> well-being and safety. Petitioner is marginally compliant with his PYAP advocate services. Petitioner has made no progress in attending school, whether it be physical or cyber school. . . . The [juvenile] court has imposed conditions of probation that are consistent with the protection of the community and enable Petitioner to develop competencies to become a responsible and productive member of the community as required by the Juvenile Act. By his own behavior, Petitioner has demonstrated that he is in need of supervision, treatment, and rehabilitation in a structured placement. Consequently, the record supports the [juvenile] court's disposition of out-of-home placement at this time. A commitment to the Bureau of Juvenile Justice Services Youth Forestry Camp #3 is the least restrictive option, consistent with the protection of the public, and best suited for Petitioner's welfare, treatment, supervision, and rehabilitation needs.

Juvenile Court Opinion, 9/9/24, at 7-8 (unnecessary capitalizations omitted) (sic). Accordingly, we cannot conclude that the juvenile court manifestly abused its discretion, given Petitioner's repeated probation violations when less restrictive options were repeatedly and unsuccessfully made available to Petitioner and considering the attendant safety concerns for Petitioner.[9]

Finally, Petitioner claims that the juvenile court failed to consider adequately Petitioner's need for treatment, supervision, and rehabilitation under 42 Pa.C.S. §§ 6301, 6352(a). Petitions at 7, 16. We disagree.

---

[9] We decline to address Petitioner's claim that one of the individuals who was "the main focus of threatening" him was also housed alongside him at PJJSC, *see* Petitions at 15, because this claim, or any evidence relating thereto, was not presented at any of the hearings before the juvenile court. *See* Pa.R.A.P. 302(a); **Commonwealth. v. Johnson**, 33 A.3d 122, 126 (Pa. Super. 2011) (noting that it is "black letter law in this jurisdiction that an appellate court cannot consider anything which is not part of the record in the case."), **appeal denied**, 47 A.3d 845 (Pa. 2012).

As stated, Sections 6301 and 6352 of the Juvenile Act and Rule 512(D) require that children should be separated from their families only when necessary for their treatment, supervision, or rehabilitation. 42 Pa.C.S. §§ 6301, 6352(a); Pa.R.J.C.P. 512(D)(4)(b).

Instantly, our review of the record reveals that the juvenile court properly considered Petitioner's treatment, supervision, and rehabilitative needs, all of which can be met in an out-of-home placement while holding him accountable for his actions and ensuring his safety. As the court explained, Petitioner would receive education, mental health counseling and other treatments to foster his personal development at YFC. Juvenile Court Opinion, 9/9/24, at 7-8. Tellingly, the court did not direct Petitioner to serve a specific amount of time at YFC, but rather conditioned his stay on his behavior there. Thus, the court was animated by Petitioner's rehabilitative needs, rather than by a desire to impose punishment. Accordingly, we cannot conclude that the juvenile court manifestly abused its discretion.

To the extent Petitioner invites us to accept his proffered version of the events, claiming that he "was not getting into trouble,"[10] and "briefly and on only few occasions violated unclear and ill-defined geographic GPS

_____

[10] The juvenile court notes that, while on probation, Petitioner picked up a new matter in adult court. **See** Juvenile Court Opinion, 9/9/24, at 7. Indeed, a review of the Municipal Court of Philadelphia County's docket indicates that in July 2024, Petitioner was charged with theft of services under 18 Pa.C.S. § 3926 at docket numbers MC-51-SU-0002315-2024 and MC-51-SU-0002533-2024. Evidence of these charges, however, was not introduced at any of the multiple hearings below.

restrictions," Petitions at 14, we decline the invitation. Our standard of review requires us to accept the juvenile court's findings of fact and credibility determinations if they are supported by the record, but does not require us to accept the juvenile court's inferences or conclusions of law. *In the Int. re T.M.A.*, 207 A.3d 375, 380 (Pa. Super. 2019). "[W]e accord great weight to the [juvenile] court's fact-finding function because the [juvenile] court is in the best position to observe and rule on the credibility of the parties and witnesses." *In the Int. re C.K.*, 165 A.3d 935, 941 (Pa. Super. 2017). Thus, we are precluded from reweighing the evidence and substituting our judgment for that of the factfinder.

Orders affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 10/02/2024